"O"

FILED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

MAR 31 2007

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

Priority
Send
Enter

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LOS ANGELES TIMES COMMUNICATIONS LLC,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF LABOR; OFFICE OF THE SECRETARY OF LABOR; OFFICE OF THE SOLICITOR OF LABOR; EMPLOYMENT STANDARDS ADMINISTRATION; OFFICE OF WORKERS' COMPENSATION PROGRAMS; DIVISION OF LONGSHORE AND HARBOR WORKERS' COMPENSATION PROGRAM and DOES 1-10,<br><br>Defendants. | CASE NO. CV 06-1864 AG (CTx)<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT |

ENTERED - SOUTHERN DIVISION
CLERK, U.S. DISTRICT COURT

APR - 2 2007

CENTRAL DISTRICT OF CALIFORNIA
BY               DEPUTY

DOCKETED ON CM

APR - 2 2007

BY            178

Before the Court is a motion for summary judgment ("Motion") brought by Defendant United States Department of Labor (the "DOL") and a cross-motion for summary judgment ("Cross-Motion") brought by Plaintiff Los Angeles Times Communications LLC (the "L.A. Times"). The L.A. Times dutifully seeks information under the Freedom of Information Act ("FOIA"), and the DOL claims a FOIA exemption precluded further disclosure of what the L.A. Times seeks. After considering all the papers filed for this motion, including the moving,

49

opposing, reply, supplemental, and responses to supplement papers, and the oral argument by the parties, the Court GRANTS the DOL's Motion and DENIES the Cross-Motion of the L.A. Times.

**BACKGROUND**

The primary issue in this case is whether 5 U.S.C. section 552(b)(6) ("Exemption 6") authorizes the DOL to withhold information about civilian contractors who have been killed or injured while supporting Allied military operations in Iraq and Afghanistan. (Defendants' Combined Opposition to Plaintiff's Motion for Summary Judgment and Reply Brief in Support of Defendants' Motion for Summary Judgment ("D. Reply") 1:6; Plaintiff Los Angeles Times Communications LLC's Reply to Defendants' Combined Opposition and Reply ("P. Reply") 1:11-14.) If the Court finds that Exemption 6 applies, the Court must then determine to what extent the information requested by the L.A. Times is protected. See 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.").

In March and April 2005, a reporter for the L.A. Times made a FOIA request to the DOL seeking "information relating to claims for Defense Base Act and War Hazards Compensation Act benefits filed by contractors who served in Iraq or Afghanistan, or by their employers or the employers' insurers." (Plaintiff's Consolidated Notice of Motion and Motion for Summary Judgment and Opposition to Defendants' Motion for Summary Judgment ("P. Opposition") 1:14-18; Plaintiff's Separate Statement of Uncontroverted Facts and Conclusions of Law in Support of Motion for Summary Judgment ("SUFCL") Exs. 1-4; Plaintiff Los Angeles Times Communications LLC's Statement of Genuine Issues and Response to Defendants' Statement of Uncontroverted Facts and Conclusions of Law ("SUF") ¶¶ 1, 4, 7, 8.) The Defense Base Act ("DBA"), 42 U.S.C. sections 1651, et seq., and the War Hazards Compensation Act, 42 U.S.C. sections 1701, et seq., extends worker compensation benefits to individuals killed or injured while serving the United States government, including civilian contractors in Iraq and

Afghanistan. In June 2005 the DOL gave the L.A. Times a substantial portion, but not all, of the information the L.A. Times had requested. (SUF ¶¶ 2, 3, 5, 6, 9, 10.)

The L.A. Times concedes that for civil contractors killed in Iraq and Afghanistan the DOL has released:

> (1) the year of injury; (2) the year of death; (3) the statute under which the injury was reported (in this case the DBA); (4) the deceased claimant's date of birth; (5) the case type (in all these instances, death); (6) the nature of the injury; (7) the location of the injury on the body (e.g., right side); (8) the specific parts of the body injured; (9) the average weekly wage of the claimant; (10) the country where the claimant was when the injury occurred; (11) the insurance company's name and address; and (12) the contract employer's name and address, if the employer had seven or more employees killed within the time frame requested.

(SUF ¶ 2.) For civil contractors killed in Iraq and Afghanistan the DOL withheld:

> the Office of Workers' Compensation Programs (OWCP) case number, the name of the deceased claimant, the address of the deceased claimant, the day and month of the injury, the day and month of the death, the sex of the claimant, the claimant's social security number, and the employer's name and address if the employer had fewer than seven employee deaths in the relevant timeframe.

(SUF ¶ 3.) The DOL released and withheld similar categories of information for civil contractors injured in Iraq and Afghanistan. (SUF ¶¶ 5, 6, 9.)

The L.A. Times appealed the FOIA requests to the Solicitor of Labor at the DOL, and in April 2006 the Solicitor of Labor denied the appeal. (SUF ¶¶ 11, 12.)

Since filing this action the L.A. Times has narrowed its FOIA request, and now no longer seeks: (1) any information about Iraqi and Afghani nationals, (P. Opposition 3:16-18); the case

numbers assigned to each claim by the OWCP, (SUF ¶¶ 6, 7; P. Opposition 8:24-27); Social Security numbers, (P. Opposition 8:24-27); dates of birth, (P. Opposition 8:24-27); and addresses of injured American contractors, (P. Opposition 8:24-27).

Thus, the L.A. Times now only requests:

> (1) the names, addresses, genders, dates of death, and employers of the deceased contractors from the United States and countries other than Iraq and Afghanistan;
> (2) the names, genders, dates of injury, and employers of injured American contractors; and
> (3) the names, addresses, genders, dates of injury, and employers of injured foreign contractors from countries other than Iraq and Afghanistan.

(P. Opposition 24:21-25:2.)

After the DOL's initial disclosures, the L.A. Times has the key information regarding the broad, general use of civilian contractors in Iraq and Afghanistan that the databases at issue have to offer. Therefore, the request for additional disclosures has a much narrower focus than simply the extensive use of civilian contractors by the United States in Iraq and Afghanistan. The L.A. Times asserts that these additional disclosures will enable the public to meaningfully evaluate whether the DOL has provided workers compensation, medical, and vocational benefits to civilian contractors and their survivors.

**LEGAL STANDARD**

Both parties agree that "this lawsuit, like virtually all Freedom of Information Act cases, should be resolved on summary judgment." (P. Opposition 9:4-5; See also D. Reply 3:14.) Indeed, it is well recognized that summary judgment is a proper means for resolving a FOIA claim. See Nat'l Wildlife Fed'n v. U.S. Forest Service, 861 F.2d 1114 (9th Cir. 1988).

The government agency bears the ultimate burden of proving that a particular document

4

falls within one of the nine statutory exemptions to the disclosure requirement. See Dobronski v. FCC, 17 F.3d 275, 277 (9th Cir. 1994). "Unlike the review of other agency action that must be upheld if supported by substantial evidence and not arbitrary or capricious, the FOIA expressly places the burden on the agency to sustain its action and directs the district courts to determine the matter de novo." U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)) (internal quotation marks omitted).

The government may submit affidavits to satisfy its burden, but "the government may not rely upon conclusory and generalized allegations of exemptions." Kamman v. IRS, 56 F.3d 46, 48 (9th Cir. 1995) (quoting Church of Scientology v. U.S. Dep't of Army, 611 F.2d 738, 742 (9th Cir. 1980) (internal quotation marks omitted). "In evaluating a claim for exemption, a district court must accord substantial weight to [agency] affidavits, provided the justifications for nondisclosure are not controverted by contrary evidence in the record or by evidence of [agency] bad faith." Minier v. CIA, 88 F.3d 796, 800 (9th Cir. 1996) (quoting Hunt v. CIA, 981 F.2d 1116, 1119 (9th Cir. 1992)) (internal quotation marks omitted). See also Kamman, 56 F.3d at 48 (same); L.A. Times Communs., LLC v. U.S. Dep't of Army, 442 F. Supp. 2d 880, 902 (C.D. Cal. 2006) (same); Gordon v. FBI, 388 F. Supp. 2d 1028, 1034 (N.D. Cal. 2005) (same).

A requester may challenge an agency's response to a FOIA request in two ways. First, the requester may claim that the agency failed to make a sufficient or reasonable search of its records. See Steinberg v. U.S. Dep't of Justice, 23 F.3d 548, 551 (D.C. Cir. 1994). Second, the requester may claim that the agency has claimed an exemption that does not apply to the records the agency has found but withheld. See Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 160-64 (2004). In this case, the L.A. Times has conceded that the "DOL has met its obligation to perform a search reasonably calculated to uncover the relevant information." (SUF ¶ 1.) Therefore, the Court here must determine whether the agency has claimed an exemption that does not apply to the records found but withheld. The only exemption the agency has asserted here is Exemption 6.

//

//

**DISCUSSION**

### 1. EXEMPTIONS

FOIA "was intended to establish a general philosophy of full agency disclosure, and to close the loopholes which allow agencies to deny legitimate information to the public . . . ." GTE Sylvania, Inc. v. Consumers Union of United States, Inc., 445 U.S. 375, 385 (1980) (internal quotation marks and citations omitted). But there are nine specific categories of records that are exempt from disclosure. See 5 U.S.C. § 552(b). Unless "the requested material falls within one of these nine statutory exemptions, FOIA requires that records and material in the possession of federal agencies be made available on demand to any member of the general public." NLRB v. Robbins Tire & Rubber Co., 437 U.S. 214, 221 (1978). The exemptions "have been consistently given a narrow compass," and agency records that "do not fall within one of the exemptions are improperly withheld . . . ." U.S. Dep't of Justice v. Tax Analysts, 492 U.S. 136, 151 (1989) (internal quotation marks omitted).

### 1.1 Exemption 6

FOIA Exemption 6 exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "Congress' primary purpose in enacting Exemption 6 was to protect individuals from the injury and embarrassment that can result from the unnecessary disclosure of personal information." U.S. Dep't of State v. Washington Post Co., 456 U.S. 595, 599 (1982).

Under Exemption 6 the threshold question is whether the requested documents are "personnel and medical files [or] similar files" under 5 U.S.C. section 552(b)(6). The Supreme Court has defined "similar file" broadly as government records containing "information which applies to a particular individual." Washington Post, 456 U.S. at 602. The L.A. Times has

6

conceded that the information it has requested "is information related to particular persons." (SUF ¶ 13.) Accordingly, the L.A. Times has requested "similar files" under Exemption 6.

To determine whether a FOIA request should be denied as an unwarranted invasion of privacy under Exemption 6, a court balances the public interest in disclosure against the privacy interest of the individual whose records are requested. See Reporters Comm., 489 U.S. at 762. Although Reporters Committee discussed FOIA Exemption 7(c), the same general balancing test applies to cases involving Exemption 6. See U.S. Dep't of Defense v. FLRA, 510 U.S. 487, 495, 496 n.6 (1994); Painting Indus. of Hawaii Mkt. Recovery Fund v. U.S. Dep't of Air Force, 26 F.3d 1479, 1482 (9th Cir. 1994); Maynard v. CIA, 986 F.2d 547, 567 (1st Cir. 1993). The only significant difference between the balancing tests under Exemption 6 and Exemption7(c) is that under Exemption 6 the government must prove that the invasion of privacy is "clearly unwarranted." U.S. Dep't of State v. Ray, 502 U.S. 164, 177 (1991).

In Ray, the Supreme Court recognized that an individual has a strong privacy interest in the disclosure of information that may lead to retaliation. See id. at 176-177 (holding that the "disclosure of the interviewees' names would be a significant invasion of their privacy because it would subject them to possible embarrassment and retaliatory action."). See also Judicial Watch, Inc. v. FDA, 449 F.3d 141, 153 (D.C. Cir. 2006) (balancing the public interest against the privacy "interest in avoiding harassment or violence"); McCutchen v. U.S. Dep't of Health & Human Servs., 30 F.3d 183, 189 (D.C. Cir. 1994) (holding that the "complainants have a strong privacy interest in remaining anonymous because, as 'whistle-blowers,' they might face retaliation if their identities were revealed."). The parties do not dispute that an Exemption 6 analysis includes the retaliation factor, and both address the issue of safety.

Courts weigh the public interest by considering the interest of the general public, not the private motives, interests, or needs of a litigant. See Reporters Comm., 489 U.S. at 762. The Supreme Court has repeatedly stated that "the only relevant public interest in the FOIA balancing analysis is the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." Bibles v. Oregon Natural Desert Ass'n, 519 U.S. 355, 355-56 (1997)

7

(citations omitted); see also Hughes Salaried Retirees Action Comm. v. Adm'r of Hughes Non-Bargaining Retirement Plan, 72 F.3d 686, 693 (9th Cir. 1995), cert. denied, 517 U.S. 1189 (1996). "Unless the invasion of privacy is clearly unwarranted, the public interest in disclosure must prevail." Ray, 502 U.S. at 177.

### 1.2    Balancing The Public Interests Against the Privacy Interests

The L.A. Times has stated that "[w]ithout accepting the [DOL's] safety argument, the [L.A. Times] agrees to exclude information relating to Iraqi and Afghan nationals from this lawsuit." (P. Opposition 3:16-18.) Therefore, the following analysis does not concern Iraqi and Afghan nationals.

The DOL argues that due "to the continued targeting of U.S. contractor employees and their families by insurgents in Iraq and Afghanistan, claimants and their families living in Iraq and Afghanistan have a particularly strong privacy interest with regard to the dissemination of information that might reveal their identities." (Motion 15:2-6.) The L.A. Times argues that the DOL has not provided any evidence that "the disclosure of information about non-Iraqi and non-Afghan contractors increase the risk of harm that these contractors already face." (Plaintiff Los Angeles Times Communications LLC's Response to Defendants' Supplemental Brief ("Plaintiff's Response") 1:9-16) (emphasis in original). The Court agrees with the DOL.

Because of some ambiguities in the papers, the Court requested additional information from both parties. From the DOL, the Court requested additional evidence supporting the assertion that family members of deceased individuals not living in Iraq or Afghanistan face a substantial risk of serious harm. The DOL initially relied solely on the Declaration of James P. McDermott ("McDermott Declaration") to support an argument that civilian contractors, and by extension their families, living outside of Iraq or Afghanistan have an overriding privacy interest in their personal information because they too are subject to acts of reprisal from terrorist organizations. (D. Reply 8:7-28.) Since the McDermott Declaration spoke only to acts of reprisal in Iraq or Afghanistan, the Court requested additional information on this issue. The

1  DOL provided the Declaration of Christopher Albrycht ("Albrycht Declaration") and the
2  Declaration of Marc D. Peltier ("Peltier Declaration") to support this argument. The Court finds
3  both of these declarations persuasive on this point.
4        The supplemental declarations state that individuals working with U.S. or Allied forces,
5  and by extension their families, are targets of terrorist groups in Iraq and Afghanistan, regardless
6  of the individual's ethnicity. The L.A. Times has objected to both these declarations on separate
7  grounds. The L.A. Times objects to the Albrycht Declaration because it "is not dated and
8  contains no statement that it is signed under penalty of perjury." (Plaintiff's Objections to
9  Evidence Submitted by Defendants in Support of Supplemental Brief ("Supplemental
10 Objections") 6:15-26.) The DOL has submitted an additional Albrycht Declaration correcting
11 these deficiencies. Accordingly, the Court OVERRULES the L.A. Times' objections to the
12 Albrycht Declaration. The L.A. Times also objects to portions of the Peltier Declaration
13 asserting that statements were either hearsay or the statements were not the proper subject of lay
14 opinion. (Supplemental Objections 1:9-5:22; 4:23-5:22.) But the L.A. Times has submitted
15 evidence supporting some of the very statements in the Peltier Declaration it now claims are
16 objectionable. (SUFCL Exs. 13, 15.) Further, in some of the objections the L.A. Times fails to
17 properly consider the stated experience of some of the Declarants which allows them to provide
18 percipient testimony. Accordingly, these objections are OVERRULED.
19       Christopher J. Albrycht ("Albrycht") has impressive experience. He is "the Chief of the
20 Iraq, Middle East Division of the Joint Intelligence Task Force for Combating Terrorism
21 (JITFC-CT) at the Defense Intelligence Agency (DIA)." (Albrycht Decl., ¶ 1.) Before
22 becoming the "Chief of the Iraq, Middle East Division, [Albrycht] served as chief for the
23 Afghanistan branch [of the] JITFC-CT." Id. "As the Chief of Iraq, Middle East Division,
24 [Albrycht] is responsible for monitoring and analyzing intelligence regarding the threat of
25 terrorism inside Iraq, as well as the threat emanating from Iraq." (Albrycht Decl., ¶ 2.) As part
26 of his "official duties, [Albrycht reviews] intelligence reports from Iraq regarding the threat of
27 terrorism, including the threat faced by contract personnel." (Albrycht Decl., ¶ 3.) When
28 Albrycht was chief of the Afghanistan branch of the JITFC-CT, Albrycht reviewed similar files

for that region. Id.

The Albrycht Declaration states that in Iraq and Afghanistan there have been "numerous instances of terrorist, insurgent and criminal groups targeting individuals working with or for United States contractors" and that civilian contractors "continue to be prime targets" for these groups. (Albrycht Decl. ¶¶ 5, 6.) Further, the Albrycht Declaration states that the "terrorist, insurgent and criminal groups in Iraq and Afghanistan do not make any distinction based on ethnicity. Anyone working with Americans has been and will be targeted." (Albrycht Decl. ¶ 7.) The Albrycht Declaration explains that the "families of these workers are – by extension – threatened to the same extent as the workers themselves." (Albrycht Decl. ¶ 7.) The Albrycht Declaration concludes with the statements that the "release of names or other identifying information of individuals of any nationality working for or with American forces or contractors in Iraq or Afghanistan, places those *individuals and their families at risk of extortion, kidnap, torture or death, at least in those two countries and potentially around the world.*" (Albrycht Decl. ¶ 10) (emphasis added).

Albrycht concedes that to "date, the targeting of these individuals working with American contractors in Iraq and Afghanistan has been confined to individuals and families in the respective countries." (Albrycht Decl., ¶ 9.) But Albrycht also states that even though "[w]e have not seen attacks on individuals or families residing in the United States or third countries, . . . *Jihadist propaganda certainly encourages such attacks.*" Id. (emphasis added). Further, Albrycht continues, "[w]e have also seen an increase in the threat of *attacks abroad* inspired by al-Qaeda' Jihadist rhetoric, regardless of direct connections to the Iraq- or Afghanistan-based groups themselves." Id. (emphasis added). Although the al Qaeda attacks of September 11, 2001 were not in retaliation against those aiding the U.S. military, they dramatically demonstrated the ability of Jihadists to kill in the United States. The DOL failed to cite any examples of successful murderous attacks outside Iraq and Afghanistan, but it is beyond dispute that such examples abound. For example, on July 11, 2006, 209 people were killed and more than 700 were injured when terrorists attacked trains in India. On July 7, 2005, 52 people were killed and more than 700 people were injured when terrorists attacked London's mass transit

system. On March 11, 2004, 191 people were killed and over 2,000 people were injured when terrorists attacked Spain's mass transit system. In 2002, Daniel Pearl, while on assignment in Pakistan, was kidnapped, held hostage, and eventually beheaded by terrorists.

Marc D. Peltier ("Peltier") is the Vice President for L-3 Communications Titan Corporation ("L-3 Titan"). (Peltier Decl., ¶ 1.) L-3 Titan has a contract with the United States Department of Defense to provide linguists to U.S. armed forces in Iraq and Afghanistan. (Peltier Decl., ¶¶ 1, 3.) Peltier is responsible for the management of L-3 Titan's "linguist resources deployed to Iraq, Afghanistan and other foreign areas." (Peltier Decl., ¶ 1.) Peltier states that the nature of the work by linguists in Iraq and Afghanistan places both the linguists and their families at risk of kidnaping or death. (Peltier Decl., ¶ 3.) Further, Peltier states "that linguists and their families have become the target of successful assassinations." (Peltier Decl., ¶ 2.) Peltier explains that because of the magnitude of the risks involved,

> L-3 Titan goes to great lengths to protect information pertaining to [its] linguist employees in order to protect them from harm. L-3 Titan also takes other steps to prevent them from becoming targets of enemy intelligence agents or those who would kidnap or kill them. These steps include restrictions on travel by non local national linguists when in a deployed environment. L-3 Titan also keeps the names, addresses and other personal information of these linguists confidential in light of this fear that they could become the targets of assassinations.

(Peltier Decl, ¶ 3.)

The Peltier Declaration states that terrorist "organizations, such as al Qaeda and their affiliates, have world wide reach and .... [t]his information would enable these organizations to plan operations targeted at linguists or their families in the *United States and abroad*." (Peltier Decl. ¶ 6) (emphasis added). Peltier explains that,

11

> al Qaeda and other similar organizations have routinely captured and killed those that have supported the Global War on Terrorism. If a particular neighborhood in either the United States or abroad became associated with the recruitment of linguists, terrorist organizations would be able to target such locations. This would accomplish two of their professed goals: killing those that support the United States; and, deterring others from doing the same. The various methods by which such information could be used to the detriment of linguists, their families or the military forces they support is limited only by the creativity of the terrorists' mind.

(Peltier Decl., ¶ 6.)

The Peltier Declaration also raises another concern not previously addressed by either party. Peltier states, "[i]nformation related to these linguists and their injuries will help insurgents and terrorists to kill or maim more linguists in the future even if it is not possible to determine the names of the individuals from a release of information." (Peltier Decl., ¶ 7.) Peltier explains that

> Any data that can be used by a terrorist or insurgent to assist them in the assessment of their effectiveness will help them refine their strategies to kill, kidnap or maim linguists as well as the US, Allied and local national forces that they support. For example, a terrorist organization may have read in a news report that an attack occurred at a particular place or time. They may never learn, however, how effective the attack was or whether it was effective at all. Documents that provide information related to the attack, such as dates or times or nature of injuries, would enable the enemy to refine its techniques so as to kill more people more effectively.

Id. However, since this concern is not specifically within the purview of Exemption 6, it is not

particularly helpful in this Court's current analysis.

Additionally, the L.A. Times has submitted evidence supporting its Cross-Motion that also supports the validity of Albrycht's and Peltier's statements. Exhibit 13 to the SUFCL, an article from the L.A. Times authored by Christian Miller, depicts the very real and very serious threat civilian contractors face in Iraq on a daily basis. For example, the article states that workers in Iraq "have been followed, threatened, shot at and kidnapped." (SUFCL, Ex. 13, p. 63.) And "[e]very one of more than a dozen Iraqi workers interviewed said *relatives* or co-workers had been killed." Id. (emphasis added). Exhibit 15 to the SUFCL, another piece from the L.A. Times authored by Christian Miller, is an editorial describing the tragedy of 12 civilian contractors from Nepal who, while heading to work in Iraq, were kidnapped, held in captivity, and then executed two at a time by Iraqi insurgents.

The DOL has also provided the Declaration of Miranda Chiu ("Chiu Declaration"), an employee of the DOL who oversees distribution of benefits under the DBA. (Chiu Decl., ¶ 1.) Ms. Chiu states that because of concerns over the safety of civilian contractors working with the U.S. in Iraq, the DOL sends all mail to claimants by "care of the claimants' employer, with a request that the employer do its best to forward the mail to the claimant." (Chiu Decl., ¶¶ 10-11.) Ms. Chiu explains that such concerns were partially the result of a claimant's home being "machine gunned" after a letter from the Division of Federal Employees' Compensation was delivered to her house in Iraq. (Chiu Decl., ¶ 7.)

The L.A. Times argues that the Albrycht and Peltier declarations contain "speculative and conclusory testimony [that] does not come close to meeting the [DOL's] evidentiary burden under Exemption 6." (Plaintiff's Response 4:3-4.) The L.A. Times primarily relies on Associated Press v. U.S. Dep't of Defense, 410 F. Supp. 2d 147 (S.D.N.Y. 2006), to support its argument. But Associated Press is distinguishable.

In Associated Press, plaintiff had submitted a FOIA request to the Department of Defense ("Department") seeking "portions of the transcripts (and related documents) of the Guantanamo tribunal proceedings in which the detainees revealed their names, nationalities, home locales, and other 'identifying information.'" Id. at 152. The Department argued that "such disclosure

13

would constitute a clearly unwarranted invasion of the detainees' personal privacy because of the risk that it would subject the detainees, and their families, friends, and associates, to possible embarrassment and retaliation . . . ." Id. The court held that the Department had to comply with the FOIA request because "the detainees never had a reasonable expectation that the information they provided to the Guantanamo tribunal would remain private," and even if they did "the Department had not offered any competent evidence of the alleged risks that would warrant the categorical exclusion of the identifying information." Id.

Here, unlike in Associated Press, the DOL, and even the L.A. Times, has offered evidence that civilian contractors have been *specifically targeted* by enemies of Allied forces, and that the civilian contractors continue to be prime targets for enemies of Allied forces. (Albrycht Decl., ¶¶ 5-9; Peltier Decl., ¶¶ 1-3; SUFCL Exs. 13, 15.) Further, the L.A. Times concedes that "hundreds of contractors have been killed in the wars in Iraq and Afghanistan, and thousands more have been injured." (Plaintiff's Response 2:20-21.) Because no one disputes the very real and very serious threat civilian contractors face in Iraq and Afghanistan, and the fact that deaths have occurred, Associated Press is not helpful here.

"In evaluating a claim for exemption, a district court must accord substantial weight to [agency] affidavits, provided the justifications for nondisclosure are not controverted by contrary evidence in the record or by evidence of [agency] bad faith." Minier, 88 F.3d at 800 (quoting Hunt, 981 F.2d at 1118) (internal quotation marks omitted). The L.A. Times has failed to provide any evidence contradicting the Albrycht or Peltier Declarations, and in fact has largely supported these declarations.

The Court recognizes the interest the public has in: (1) "scrutinizing the [DOL's] administration of contractors and their survivors;" (2) "overseeing the expenditure of taxpayer funds used to subsidize these benefits programs;" and (3) "evaluating how the [DOL] determines death benefits for the families of foreign contractors who are killed in Iraq and Afghanistan." (P. Reply 5:13-22.) But after balancing the public interest in disclosure against the privacy *life or death* interest of the individual whose records are requested, the Court finds the invasion of privacy "clearly unwarranted." Cf. New York Times Co. v. NASA, 782 F. Supp. 628, 632

(D.D.C. 1991). In New York Times v. NASA, the court denied a FOIA request under Exemption 6 for an audiotape of the Space Shuttle Challenger astronauts' last words because the invasion of privacy was clearly unwarranted. The life or death issues now before this Court weigh even more heavily in the balance. Therefore, the DOL properly withheld information revealing the identity of *all* civilian contractors. Cf. L.A. Times Communs. v. U.S. Dep't of Army, 442 F. Supp. 2d at 902 ("Defendants prevail here because they have met their burden, and the balancing of the public interest in the names . . . is outweighed by the need to protect the life and safety of those individuals exposed to the hazards of the complex battlefield on which they operate in Iraq.")

### 2. SEGREGATION

At the very least the DOL has proven that the disclosure of identifying information for civilian contractors currently residing in Iraq or Afghanistan is a clearly unwarranted invasion of personal privacy. (Albrycht Decl., ¶¶ 5-10; Peltier Decl., ¶¶ 1-3; SUFCL Exs. 13, 15.) Further, the DOL has provided undisputed evidence proving that it has no way to segregate out other civilian contractors from those currently residing in Iraq or Afghanistan. Thus, even if the Court had determined that there was an insufficient showing of danger to those *outside Iraq and Afghanistan*, the DOL properly withheld all the information requested.

The FOIA requires that any "reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). The agency has the burden to prove that no segregable non-exempt portion remain withheld. See Allen v. CIA, 636 F.2d 1287, 1293 (D.C. Cir. 1983). Agencies may meet this burden by describing through affidavit, in a non-conclusory manner, why such information is not reasonably segregable. Wilkinson v. FBI, 633 F. Supp. 336, 350 (C.D. Cal. 1986). An agency cannot justify withholding an entire document simply by showing that it contains some exempt material. Instead, the non-exempt portions must be disclosed unless they are "inextricably intertwined" with the exempt portions. Mead Data Cent., Inc. v. U.S. Dep't of Air Force, 566

F.2d 242, 260 (D.C. Cir. 1977).

Both parties agree that there is no way to determine where the contractor or the family of the contractor currently resides. The DOL asserts that the "two databases at issue . . . do not contain any information by which to determine whether the employees are Iraqis, Afghanis, present in Iraq or Afghanistan, or have family in Iraq or Afghanistan." (Defendant's Supplemental Brief ("D's SB") 7:24-8:2.) Further, the DOL asserts that "neither the addresses nor the Social Security numbers is sufficiently accurate to serve as a reliable proxy." (D's SB 8:2-5.) The DOL asserts, therefore, that it complied with the FOIA request because "the databases do not permit segregation of those at risk of physical harm." (D's SB 10:1-2.) The L.A. Times, while arguing that the databases contain sufficient information to determine whether the individual contractor is an Iraqi or Afghan national, admits that the "addresses and social security numbers are not intended to function as census tools or as a Global Positioning System that discloses a contractor's present location; rather, they are intended to provide a reasonable indication of whether a particular individual is an Iraqi or Afghan national." (Plaintiff's Response 8:5-9:15.) Based on the undisputed evidence, the DOL has no way of determining the current geographic location of a civilian contractor claimant or the current geographic location of the family of a deceased civilian contractor claimant. (Second Supplemental Declaration of Miranda Chiu; Second Supplemental Declaration of Edward Duncan.)

The FOIA requires that any "reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). Because there is no way for the DOL to segregate out civilian contractors currently residing in Iraq or Afghanistan, the DOL properly withheld all the information requested. See, e.g., Willamette Industries, Inc. v. United States, 689 F.2d 865, 867-868 (9th Cir. 1982) ("'Non-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions' such that exclusion of exempt information would impose significant costs on the agency and produce an edited document with little informational value.") (quoting Mead Data Central, 566 F.2d at 260-261); PHE, Inc. v. U.S. Dep't of Justice, 983 F.2d 248, 252 (D.C. Cir. 1993) (holding that "non-exempt portions of a document must be disclosed unless they are

inextricably intertwined with exempt portions."); Vaughn v. Rosen, 484 F.2d 820, 825 n.19 (D.C. Cir. 1974) (explaining that "[i]t may be, of course, that the exempt and non-exempt portions are so inextricably intertwined that it is impossible to separate them.").

### 3. OTHER REQUESTED RELIEF

The L.A. Times asserted in oral argument that even if the DOL properly invoked Exemption 6, and even if the exempted information could not be segregated from the non-exempt information, the Court should send a letter to the individuals whose home addresses are outside Iraq and Afghanistan to see if they would like to waive their privacy interest. There is no need for this additional step. After a court finds that an exemption has been properly invoked and that no segregable non-exempt portion has been improperly withheld, the analysis should end. Because the Court has made both of these necessary findings, the Court's analysis is complete.

## DISPOSITION

For the reasons stated, the DOL's Motion is GRANTED and the Cross-Motion by the L.A. Times is DENIED. Counsel for the DOL is directed to prepare the judgment and serve it on the L.A. Times. The L.A. Times shall have 15 days from the date of service of the proposed judgment to object to the proposed judgment. If no objection is received within 15 days, the judgment will be entered immediately.

IT IS SO ORDERED.

DATED: March 31, 2007

_____
Andrew J. Guilford
United States District Judge